**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| **THOMAS J. HAWKINS,** | No. CV 05-6854 AJW |
| **Plaintiff,** | |
| v. | MEMORANDUM OF DECISION |
| **JO ANNE B. BARNHART,** **Commissioner of the Social** **Security Administration,** | |
| **Defendant.** | |

Plaintiff filed this action seeking reversal of the decision of the defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance benefits. The parties filed a Joint Stipulation ("JS") setting forth their contentions with respect to the disputed issue(s).

**Administrative Proceedings**

Plaintiff filed an application for disability insurance benefits on June 16, 1998, and an application for supplemental security income benefits on February 28, 1999. [JS 2; Administrative Record ("AR") 80-83, 283]. Plaintiff alleged that he had been disabled since April 1, 1994, due to chronic depressive disorder, anxiety, irritable bowel syndrome ("IBS"), lupus, and chronic low back pain. [AR 80-85]. Plaintiff's applications were denied initially, upon reconsideration, and following

an administrative hearing before Administrative Law Judge Robert A. Evans (the "ALJ"). [JS 2; AR 14-26, 64-67, 70-73]. After the Appeals Council denied plaintiff's request for review, he filed a complaint for judicial review. On March 20, 2002, a judgment was entered reversing the Commissioner's decision denying benefits and remanding the case for further administrative proceedings. [AR 304-319].

The Appeals Council issued an order remanding this case to the same ALJ, who conducted two hearings on remand (on July 24, 2003 and October 7, 2003). [AR 590-647]. In a written decision dated December 5, 2003, the ALJ found that plaintiff was disabled beginning on May 2, 1997, and therefore that he was eligible for supplemental security income payments based on his February 28, 1999 application. [AR 288]. Because plaintiff's date last insured was December 31, 1995, however, he was not eligible for disability insurance benefits based on his June 16, 1998 application. [AR 288]. That decision became the Commissioner's final decision on remand. Plaintiff timely filed this action contending that the ALJ improperly found that he was not disabled prior to his date last insured.

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or if it is based on the application of incorrect legal standards. Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is more than a mere scintilla but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Thomas, 278 F.3d at 954. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)); Thomas, 278 F.3d at 954. The court is required to review the record as a whole, and to consider evidence detracting from the decision as well as evidence supporting the decision. Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

**Plaintiff's Contentions**

Plaintiff contends that the ALJ erred in determining that he was not disabled prior to his date last insured, and that the ALJ erred in evaluating the testimony of a lay witness, plaintiff's daughter. [JS 5].

**Discussion**

**Date of onset of disability**

Plaintiff contends that the medical expert's testimony did not constitute substantial evidence supporting the inference that plaintiff's mental impairment became disabling in May 1997, rather than prior to his date last insured on December 31, 1995. Plaintiff alleges that he became disabled in April 1994, or no later than before his date last insured.

Where, as here, a claimant's disability is of "nontraumatic origin," determining the date of onset "involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." Morgan v. Sullivan, 945 F.2d 1079, 1082 (9th Cir. 1991) The "primary element in the onset determination" is the medical evidence, but when considering "slowly progressive impairments," as in this case,

> it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.... In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.
>
> ...
>
> How long the disease may be determined to have existed at a disabling level of severity depends on the informed judgment of the facts in the particular case. *This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.*

Morgan, 945 F.2d at 1082 (ellipses and emphasis in original) (quoting SSR 83-20); see Armstrong v. Commissioner of the Social Security Administration, 160 F.3d 587, 590 (9th Cir. 1998)(holding that when an onset date must be inferred, the administrative law judge must call upon a medical

1 expert and must "create a record which forms a basis for that onset date"). "[A]fter the ALJ has
2 created a record and has a basis for selecting an onset date, the claimant who wishes to challenge
3 that date bears the burden of proof." Armstrong, 160 F.3d at 590.

4     Here, the ALJ satisfied his obligation by adducing additional evidence, including medical
5 expert testimony, and by making an "informed judgment" as to the date of onset based on the
6 testimony and medical evidence. Because the ALJ satisfied his obligation to "create a record which
7 forms a basis for" the May 1997 onset date, plaintiff has the burden of proof proving that the date
8 selected by the ALJ is wrong.

9     Plaintiff was sixty-three years old when the ALJ issued his decision on remand. [AR 285].
10 He was a high school graduate and attended a few years of college. [AR 38]. Plaintiff testified that
11 from 1978 until 1994, he owned and operated a small business that sold and serviced electronic data
12 collection equipment. [AR 40-42, 89, 628-629]. Plaintiff testified "the business just kind of died on
13 me, '90-'91, somewhere in there ...." [AR 627]. Plaintiff said that when his daughter stopped
14 working full-time for him in 1989, he "had to start doing the service [of the equipment] and, frankly,
15 I really struggled with it, you know. I wasn't that conversive with the actual repair of the equipment
16 and some of the other things and, you know, one-by-one over a period of time, I lost my customers."
17 [AR 629].

18     Plaintiff's daughter, Tracy Raffaele, worked for plaintiff full-time from the mid-1980s until
19 1989, when she left because her first child was born. [AR 628-629, 637]. She testified that she did
20 some part-time work for plaintiff "on and off" after that. [AR 637-639]. She testified that when she
21 left in 1989, "sales were pretty much non-existent," and "service was keeping things going
22 basically." [AR 637]. Although the company had done well before plaintiff relocated from Houston
23 in 1984 or so, "at some point, he just kind of stopped, didn't have the ability to function that way
24 anymore," did not respond to the suggestions made by her or his other employees about how to
25 improve the business. [AR 637-638]. Plaintiff's daughter said that he "just didn't relate anymore"
26 because of "his own internal problems.... I could tell there were problems. I don't know how to
27 explain it." [AR 638]. Her father was "crabby," "got angry easier, you know, didn't listen to
28 suggestions, like I said. I avoided situations because I didn't want to deal with it." [AR 638]. She

testified that during the summer of 1994, she and her family spent the summer with her father due to her husband's job relocation, and she tried to help her father with "what was left of the business which was pretty nil." [AR 639]. She that the paperwork was "totally disorganized," and she noted the contrast between his situation at that point, when he had lost his summer home, car, and his business, to the affluent standard of living the family had enjoyed when she was a child. She also noted that he was having sleep and memory problems that summer. [AR 639-640].

From September 1999, after his alleged onset date, until July 2002, plaintiff testified that he had a "permanent, part-time job" as a teacher's assistant at Work Center for Independent Living ("WCIL"), a state-funded school that taught computer skills to people with disabilities. [AR 38-39, 623]. Plaintiff stated that he worked approximately two hours a day, five days a week, for minimum wage. [AR 38]. Plaintiff said that he began that job after completing most of a ten-month vocational rehabilitation program at WCIL. [AR 38, 47-48]. Plaintiff also testified that in 2000 and 2001, in addition to his job at WCIL, he worked part-time on a call-in basis, demonstrating computer printers at an electronics retailer for two to four hours a day on weekends. [AR 620-622]. According to an earnings record that the ALJ said he had before him (but which does not seem to be included in the record), plaintiff's earnings were almost $11,000 in 2000 and rose to $16,000 in 2001.[1] [AR 285, 623-624]. Plaintiff testified that those jobs were manageable because WCIL accommodated his schedule if his physical or mental symptoms flared up, and because at the printer demonstration job (which he obtained through a WCIL graduate) "if I was ill, I didn't show up, I got paid anyway. There was no clock to punch or ... forms to sign or anything." [AR 624]. Plaintiff testified that he could still perform the job at WCIL because he could set his own hours or not come in for several days if needed. [AR 624].

Plaintiff testified that he received treatment for depression and anxiety at UCLA from 1987 to 1989, when he lost his insurance coverage upon his divorce. [AR 51]. He testified that he did not receive any further mental health treatment until 1995, when he learned that he had medical

---

[1] Plaintiff does not dispute those figures, but he points out that the "last reported earnings were for the year 1990." [JS 16 (citing AR 83)]. The cited earnings report was generated in April 1999, so naturally it does not reflect later earnings. [AR 82].

1  coverage through the Veteran's Administration ("VA") . [AR 52].  According to his treatment
2  reports, he was seen at a VA clinic beginning in June 1994 for complaints of depression and sleep
3  apnea.  He continued to receive intermittent mental health treatment at the VA clinic in 1995 and
4  1996.  [See AR 46-47, 86, 131-160, 208-213, 216-218, 248].  His treatment records document
5  diagnoses of "recurrent depression - stable" in August 1995 and "MDE - stable" (major depressive
6  episode) in February 1996 and September 1996. [AR 205, 213]. During this period, plaintiff
7  underwent cognitive therapy and was prescribed anti-depressant medication, including Prozac and
8  trazodone. [AR 86, 131-160, 208-213, 246, 248]. He reported good results with Prozac, and his
9  symptoms were noted to be generally stable and responsive to treatment until early 1997, when
10 plaintiff reported a one-month history of increased depression and anxiety, feelings of abandonment
11 by his family, and suicidal ideation. [AR 159, 175-176, 180, 203-215]. It appears that this
12 exacerbation prompted his VA doctors to place plaintiff in a "day hospital" program from May 1997
13 through October 1997. [AR 131-160].

14         The record includes two letters from Dr. Kohler, a licensed clinical psychologist who served
15 as plaintiff's case manager at the VA hospital.  Dr. Kohler wrote one undated letter stating that
16 plaintiff "has reported and on occasion displayed memory problems associated with" depression and
17 an inability to manage stress. [AR 248].  He stated that plaintiff's "often disorganized lifestyle" is
18 "partially and significantly related to his clinical depression, for which he is still receiving
19 psychotropic medications." [AR 248].   Dr. Kohler also noted that the intermittent nature of
20 plaintiff's treatment was due to VA constraints, because "we do not treat most patients for more than
21 3-4 months per crisis episode." [AR 248].

22         In letter to the ALJ dated October 27, 1999, Dr. Kohler stated that plaintiff was diagnosed
23 with "Major Affective Disorder Depression DSM III," with components of anxiety disorder, post-
24 traumatic stress disorder, and obsessive compulsive disorder. [AR 251].  Dr. Kohler opined that
25 "[t]hese symptoms continue today and along with IBS and Diverticulitis (for which he has been
26 hospitalized) result in his difficulties in managing his life." [AR 251].  Dr. Kohler also concluded
27 that plaintiff's part-time job with WCIL was "the best and possibly only job [plaintiff] could
28 manage." [AR 251].

1   Dr. Ohning, who was affiliated with the gastroenterology division of the VA hospital,
2   submitted letters dated August and October 1999 stating that plaintiff was under his care "for a
3   variety of medical problems including irritable bowel syndrome, incontinence, post-traumatic stress
4   disorder with depression and anxiety components. These conditions are causing significant
5   symptoms at this time and can be considered disabling for steady employment." [AR 249]. Dr.
6   Ohning also explained that IBS "is capable of causing frequent and unpredictable abdominal pain
7   which can become incapacitating and require the patient to cease activities" and "can limit the
8   patient's ability to obtain employment" and "to meet the expectations of most employers." [AR 250].
9   In addition, Dr. Ohning noted that the association between stress and exacerbations of IBS "has been
10  well-documented," and that this link "can be particularly problematic in patients" with post-
11  traumatic stress disorder. [AR 250].

12  The psychiatric expert, Dr. Charles Angler, opined that the diagnoses listed by Dr. Kohler
13  in his letters "could be probably gathered together as a single diagnosis of PTSD [post-traumatic
14  stress disorder] or borderline personality disorder, although he certainly has a good case for major
15  affective disorder, as well." [AR 604]. Dr. Angler testified that he had a "hard time figuring out
16  when [plaintiff] became disabled," and that "the best [he] can do" is to say that plaintiff became
17  disabled some time before May 2, 1997, when his symptoms spiked and he had suicidal ideation
18  prior to entering the day hospital program. [AR 606]. Asked by the ALJ if "the record would support
19  going back into the year 1995 at all," Dr. Angler commented that the medical records showed that
20  plaintiff was getting good results on Prozac at that point, and that although the August 1995
21  treatment note mentions a prior period of day hospital treatment, there was no corroboration of that
22  in the records. [AR 607]. He also observed that the record did not contain a "good psychological
23  evaluation," but that there was a psychiatric evaluation by Dr. Kohler in July 1999 and a "lengthy
24  series of progress notes" which supported the conclusion that plaintiff was disabled by that point.
25  [AR 605].

26  The gist of plaintiff's argument is that the ALJ could have inferred an earlier onset date
27  because there were records of treatment for depression before 1997 and because the medical expert
28  could not rule out an earlier date of onset. Plaintiff also faults the ALJ for not "encouraging an

1 'inferring' of the onset date" by Dr. Angler through correcting or further questioning him when he
2 "seemed to be searching" for records of an evaluation or hospitalization, "neither [of which] is
3 required to infer disability." [JS 9].

4       As explained in Morgan, the process of inferring an onset date in disabilities of nontraumatic
5 origin requires the ALJ to elicit testimony from a medical expert, as the ALJ did here, and also to
6 consider the medical evidence and other evidence in order to make an "informed judgment of the
7 facts in the particular case." Morgan, 945 F.2d at 1082. Although plaintiff was treated for
8 depression in 1995 and 1996, Dr. Angler testified that the evidence did not indicate that his
9 condition was disabling at that point in time, and that conclusion is consistent with plaintiff's
10 diagnoses, treatment history, and the treatment notes from that period. Dr. Angler made it clear that
11 he found the medical evidence inconclusive as to the exact date of onset and that his opinion
12 represented his best approximation of the onset date, given the limitations of the medical evidence.
13 [AR 605-608]. When asked by the ALJ whether the record would support a date in 1995, Dr. Angler
14 testified that the records, such as they were, indicated that plaintiff was responding fairly well to
15 treatment at that time. [AR 607]. Accordingly, the ALJ did not err in failing to press him for a more
16 definitive opinion. The ALJ also had no need to "correct" Dr. Angler when he suggested that it
17 would have been helpful to have a complete psychological evaluation from that period or additional
18 records of day hospital treatment (if there were any). Dr. Angler did not intimate that he believed
19 he could not infer the existence of a disability without that evidence, only that having such evidence
20 would have assisted him in pinpointing the onset date.

21       Plaintiff points out that statements that a claimant diagnosed with a mental impairment is
22 "'doing well, responding to treatment, and 'feels well' must be read in the context of the overall
23 diagnostic picture the doctor draws," and that periods of symptom remission are not necessarily
24 inconsistent with a serious mental impairment. [JS 8]. That contention is accurate, as far as it goes.
25 The weakness in plaintiff's argument is that "the overall diagnostic picture" drawn by plaintiff's
26 treating doctors before early 1997 depicts someone whose depression was responding to treatment
27 and was not disabling. Indeed, when plaintiff's symptoms worsened in February 1997, it was noted
28 in his treatment reports that he had a history of "good response" to therapy in "88-89, 94-95." [AR

1  175]. No treating or examining physician suggested that plaintiff was disabled until October 1999,
2  when Dr. Kohler wrote that plaintiff's job with WCIL was "the best and possibly only job [plaintiff]
3  could manage" [AR 251], and Dr. Ohning opined that plaintiff's physical and mental conditions "can
4  be considered disabling for steady employment." [AR 249]. In his undated and presumably earlier
5  letter, Dr. Kohler did not opine that plaintiff was disabled, but rather that plaintiff "has reported and
6  on occasion displayed memory problems," and that his "often disorganized lifestyle" is "partially,"
7  albeit "significantly," related to his depression. [AR 248].

8        Plaintiff also argues that the Fifth and Eighth Circuits have "found that retrospective medical
9  diagnosis even uncorroborated by contemporaneous medical reports but corroborated by evidence
10 relating back to the claimed period of disability can support finding of past impairment." [JS 8
11 (citing Likes v. Callahan, 112 F.3d 189 (5th Cir. 1997)(per curiam)]. What plaintiff means,
12 presumably, is that plaintiff's treating doctors' 1999 diagnoses and disability opinions should be
13 construed to apply to plaintiff's condition three or four years earlier.

14       Likes is distinguishable. First, unlike in this case, "[t]wo mental health professionals ha[d]
15 opined that [the claimant] has suffered from chronic PTSD since 1966," nearly twenty years before
16 his date last insured, and his wife also testified that the claimant had "poor anger control and
17 dissociative episodes since 1981," a few years before the date last insured. Likes, 112 F.3d at 190.
18 Second, the ALJ in Likes had not elicited testimony from a medical expert, so that the remand for
19 further proceedings in that case would provide a meaningful opportunity for further development
20 of the record. Third, the Fifth Circuit explicitly adopted the Eighth Circuit's rule that "retrospective
21 medical diagnoses, uncorroborated by contemporaneous medical reports but corroborated by lay
22 evidence relating back to the claimed period of disability, could support a finding of past
23 impairment." Likes, 112 F.3d at 191 (citing Jones v. Chater, 65 F.3d 102, 103-104 (8th Cir.1995)).
24 The Ninth Circuit has held that "[r]etrospective diagnoses by treating physicians and medical
25 experts, contemporaneous medical records, and testimony from family, friends, and neighbors are
26 all relevant to the determination of a continuously existing disability with onset prior to expiration
27 of insured." Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1461 n.5 (9th Cir.1995).
28 The Ninth Circuit, however, also has cautioned against using a retrospective diagnosis to "tack on"

1 a later or recurrent period of disability beginning after the expiration of insured status to a prior
2 period of disability that began before the date last insured, unless the claimant can show that "the
3 current period of disability extends back *continuously* to an onset date prior to the expiration of
4 insured status." Flaten, 44 F.3d at 1461 (italics added). The medical diagnoses and opinions in this
5 case do not establish that plaintiff became disabled before December 31, 1995 and remained
6 continuously disabled from that point until at least May 1997, the date of onset inferred by the ALJ.

7 The ALJ did not rely exclusively on Dr. Angler's testimony or characterization of the record.
8 The ALJ also observed that the progress notes clearly showed a worsening of plaintiff's depression
9 in 1997, when plaintiff reported that during the past month, he had experienced increased depression
10 and anxiety with feelings of abandonment by his family and suicidal ideation. [AR 175-176, 286-
11 287]. He was diagnosed at that time with depression and alcohol dependence, "a factor Dr. Kohler
12 appears to have forgotten in his October 1999 comments." [AR 286]. Plaintiff's 1995 records
13 showed "recurrent" depression and outpatient treatment, and he subsequently was described as
14 having stable mood, eating well, sleeping well, and no complaints in January, February, and
15 September 1996. [AR 286]. When he was hospitalized in April and May 1996 for obstructive sleep
16 apnea, plaintiff was taking medication for depression and an alcohol problem was mentioned, but
17 there was "no mention of psychiatric contraindications" to the surgery. [AR 286]. Plaintiff had no
18 in-patient psychiatric hospitalizations. [AR 286]. When he reported an increase in his symptoms
19 in February 1997, plaintiff also admitted he was consuming alcohol daily. [AR 159, 175-176, 286].
20 By April 1997, he said he had last consumed alcohol two weeks earlier but admitted that up to that
21 point he had still been drinking several times a week. [AR 176, 286]. Drinking alcohol was "a factor
22 that presumably would affect his depression." [AR 287].

23 The ALJ also observed that Dr. Kohler's notes "are generally cursory and brief," without
24 indications of mental status testing after treatment "or an assessment of the claimant's condition or
25 actual daily functioning with medication compliance." [AR 287]. Dr. Kohler asserted that plaintiff
26 was disabled, but it was "impossible to discern" from his notes what plaintiff's response to
27 medication had been, whether he was compliant with his medication, or how his functioning was
28 limited. [AR 287].

The ALJ permissibly considered, as one factor in the onset determination, plaintiff's earnings and work history from September 1999 to September 2002, all of which occurred after his date last insured. The ALJ found that his job activities in 2000 and 2001 were substantial gainful activity "and must be taken into consideration in computing the benefits established by this award." [AR 285]. Although plaintiff's work for WCIL in 1999 and 2002 did not rise to the level of substantial gainful activity, the ALJ nonetheless reasonably concluded that plaintiff's work history undermined the credibility of his allegations of continuously disabling symptoms beginning before his date last insured. See Morgan, 945 F.2d at 1082 (stating that the ALJ may consider a claimant's work history in determining the onset date).

The ALJ fulfilled his burden to create a record that forms the basis for inferring an onset date. On remand, the ALJ conducted two hearings; he adduced testimony from two medical experts and a vocational expert; he obtained new evidence regarding plaintiff's earnings; he obtained new testimony from plaintiff and plaintiff's daughter; and he received additional exhibits into evidence. [See AR 590-647]. The ALJ therefore met his obligation to "create a record" from which to infer an onset date. Plaintiff has not met his burden to demonstrate that the ALJ erred in inferring an onset date of May 1997, and substantial evidence in the record supports that finding.

**Lay witness testimony**

Plaintiff contends that the ALJ improperly disregarded the testimony of plaintiff's daughter. [JS 17-18].

"While an ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ may discount that testimony by providing 'reasons that are germane to each witness.'" Greger v. Barnhart, – F.3d –, 2006 WL 2684753, *2-*3 (9th Cir. 2006)(quoting Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir.1993)). The ALJ did not fail to discuss Ms. Raffaele's testimony, as plaintiff misleadingly asserts. [JS 18]. He considered her testimony but concluded that it fell short of establishing that plaintiff suffered from marked or disabling functional limitations due to his depression before December 1995. [AR 287]. The ALJ noted that she testified that her father "stopped relating to customers and that she avoided him because of his mood changes," but that her observations were not sufficient to show a disabling level of severity. [AR 287].

Ms. Raffaele's testimony corroborates plaintiff's testimony that he had symptoms that can be related to depression, such as irritability and problems with memory and sleep, and that those symptoms impacted his ability to function. The ALJ acknowledged that plaintiff had severe depression and mild to moderate restrictions prior to May 1997, when his restrictions became marked and disabling. The ALJ's findings were consistent with the symptoms Ms. Raffaele observed. Ms. Raffaele also testified that plaintiff's business was "nil" in 1994, when he allegedly became disabled, but the record indicates that his business had declined slowly over a long period, and that its demise was due to a number of factors. Plaintiff testified that his business "died a very slow death" over a period of several years, and that by 1990 or 1991 (three or four years before his alleged date of onset in April 1994), little was left of the once-successful enterprise. [AR 40-41, 627-629]. That is corroborated by Ms. Raffaele's testimony that "sales were pretty much non-existent" when she left in 1989. [AR 637]. Plaintiff testified that the business first began to falter when a competitor with a larger sales force entered the scene in 1986. [AR 627]. Shortly thereafter, his mother, who had been living with plaintiff and his wife, died of cancer, and then his wife, who was bipolar and had been hospitalized for depression, left him before the funeral and eventually divorced him. [AR 51]. Losing his wife bothered him "more than anything," and she also had worked with him in the business. [AR 627-628]. By 1990,

> it got to the point where I was the only left in the company, [and] I was servicing customers as they called in. And over a period of time, it became fewer and fewer and fewer customers that called. As they were replaced by competitive equipment. And also, my inability to be effective in servicing. It's just not something I was trained in. I was a salesman and had service personnel, trained people to do that work.

[AR 42]. Plaintiff testified that he only had a few calls a year from customers stopped working altogether in mid-1994, the same year that his daughter testified she tried to help him sort out what was left of the business. Ms. Raffaele testified that plaintiff's business paperwork was totally disorganized and she attributed this to his mental problems, but plaintiff testified that after his early years in business, he "wasn't really keeping records" and did not feel he could afford an accountant,

so for a number of years he did not file income tax returns or maintain other corporate records. [AR 41-43].

Furthermore, although Ms. Raffaele's testimony suggests that plaintiff was completely nonfunctional by the summer of 1994, and although plaintiff alleged that he became disabled in April 1994, he also testified that he "was operating or trying to operate the business out of my home" when the Northridge earthquake hit in 1994 and "caused a lot of devastation, both to me and to my property. I lost approximately $60,000 in inventory. And I filled out the forms .... I was, I guess, I'd have to say just too depressed to really follow up on it ...." [AR 45]. In short, the 1994 Northridge earthquake, rather than the onset of disability, appears to have been the coup de grace that finished off plaintiff's long-failing business.

The ALJ did not disregard Ms. Raffaele's testimony but instead permissibly concluded that her testimony did not demonstrate the existence of marked or disabling mental restrictions before December 31, 1995.

**Conclusion**

For the reasons stated above, the Commissioner's decision is supported by substantial evidence and reflects application of the proper legal standards. Accordingly, defendant's decision is **affirmed.**

**IT IS SO ORDERED.**

DATED: October 5, 2006

_____/s/_____
ANDREW J. WISTRICH
United States Magistrate Judge